UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 24-20264-CR-BLOOM

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

JIMMY SANCHEZ,

     Defendant.

_____/

## DEFENDANT SANCHEZ'S SENTENCING MEMORANDUM

On November 29, 2022, Jimmy Sanchez did not go to the Aladdin Hotel planning to hurt, much less kill, Julio Gonzalez. Instead, he was there at the request of a now-deceased family member to determine what had happened to a package of methamphetamine intended for delivery to Mr. Gonzalez. If successful, he was to be compensated with an undetermined sum of money and an expenses paid trip from San Diego to Miami for him and a companion. But tragically, his encounter with Mr. Gonzalez went awry when Mr. Gonzalez either could not or would not provide the desired information. A struggle ensued during which the gun that co-defendant Tsvia Kol had given to Jimmy earlier that day fell from his shirt pocket to the floor. Jimmy was then able to reach the gun first and acting more on impulse than design, fired two shots towards Mr. Gonzalez, resulting in his death.

Jimmy understands of course that his lack of premeditation does not excuse his conduct at the Aladdin. Nor do his deficits in impulse control and reasoning

1

resulting from a Traumatic Brain Injury (TBI) that he suffered in 2019. But each adds context to what occurred that day and, perhaps more importantly, each debunks any perception of him as a cold-blooded killer, which he most certainly is not.

Jimmy's brain injury in 2019 was not his first. But it was by far his most serious. The circumstances that led up to that injury are less than clear primarily because Jimmy's memory of the incident is significantly impaired.[1] The consequences, however, are irrefutable.

Within hours after Jimmy was assaulted[2] by Mexican law enforcement officers, the photograph below was posted on a community website.



---

[1] *See* PSI at ¶121. In a report filed under seal, neuropsychologist Robert Ouaou opines that Jimmy's "recollection of the events is distorted and likely the result of confabulation because of post traumatic amnesia (PTA)." *Id.* at p.2. Dr. Ouaou defines PTA as "a state of confusion, disorientation, and memory loss as a result of [TBI]." *Id.*

[2] Because of his diminished memory of what occurred, Jimmy does not recall what motivated the beating. But it apparently did not result from any criminal activity by him as he was not arrested.

Fortuitously, family members living nearby saw it and rushed to the hospital where he had been taken. When they arrived, Jimmy was tethered to the bed.  He was so disoriented that he was resisting medical intervention.  He did not recognize them. He had apparently urinated on himself.  He rambled incoherently and could not articulate what had happened.  He could not remember his name.  Fearing for his mental and physical well-being, his father and brother arranged for him to be transported to the U.S. border by the Red Cross and then to a hospital in San Diego by ambulance.  While in the ambulance, his brother witnessed him struggle to free himself from his restraints and the medical apparatus that was keeping him alive.

Although no records exist from the Mexican hospital, Jimmy's treatment in San Diego is amply documented.  He arrived at the Emergency Department (ED) as "a major trauma activation."  He was in an "[a]cute altered mental state."  He was heavily sedated due to his combativeness and needed to be intubated to enable him to breathe.  He could not "reliably answer questions."  Because of his inability to communicate, he was initially referred to as "unknown patient."  A CT scan administered on the day of admission revealed "a mild acute subdural hemorrhage" on the left side of his brain.  The ED staff noted his "potential for acute life-threatening illness."

Although the tube was removed from Jimmy's throat the following day, he was still described as confused, lethargic, and not oriented to person, place or time.  He had indicia of delirium.  Although his condition seemingly improved during the remainder of his hospitalization, he at times experienced dizziness and confusion and

3

was not oriented to time.  An evaluation for speech-language pathology administered on the day before he was discharged reflected that he had "mild language and mild cognitive communication deficits."  The latter included "reduced problem-solving/reasoning, organization and memory."

Unfortunately, despite the recommendation that he receive follow-up medical care for his injuries and the behavioral changes that resulted, Jimmy failed to heed that advice, and therefore never received physical or occupational therapy, additional medical care, or, most importantly, psychological treatment to assist in his rehabilitation.

It is of course not the TBI itself but the resulting impairments of Jimmy's brain function and concomitant changes in his behavior that help explain, but admittedly do not excuse, his conduct at the Aladdin.  Recent studies into the deleterious effects of TBI show that although not everyone who suffers one experiences chronic deficits, many will continue to demonstrate impairment in a number of cognitive domains including executive function.  One core executive function is inhibition, which governs self-control.  "Self-control is about resisting temptations and not acting impulsively."[3] The link between TBI and impulsivity is well established.  Impulsivity is a multi-faceted concept consisting primarily of two components:  motor impulsivity and choice impulsivity.[4]  Motor impulsivity (or response disinhibition) involves the "inability to

---

[3] Adele Diamond, *Executive Functions*, 64 ANN. REV. PSYCH. 135, 138 (2013).
[4] Cole Vonder Haar, et al., *Frontal Traumatic Brain Injury Increases Impulsive Decision Making in Rats: A Potential Role For the Inflammatory Cytokine Interleukin-12*, 34 J. Neurotrauma 2790, 2790 (2017).

inhibit actions," also referred to as "acting without thinking."[5]  It is characterized as "quick, impulsive, aggressive response following minimal provocation" and has been found to be "correlated with criminal behavior after TBI."[6]  Multiple studies of different types have confirmed that impulsivity, and specifically motor impulsivity, "increases following even mild [brain] injuries."[7]

The dire repercussions of TBI are not merely theoretical here.  During the pendency of this matter, Jimmy was evaluated by neuropsychologist Robert Ouaou at undersigned counsel's request.[8]  In addition to reviewing hospital records concerning the 2019 injury, he conducted a battery of tests designed to determine Jimmy's current "intellectual and cognitive strengths and weaknesses."  Report at p.4.  As expected, his weaknesses far exceed his strengths.

One of the tests Dr. Ouaou administered  earlier this year measured Jimmy's IQ at 79 which falls within the "very low" range.  Report at p.4.  While this result is itself noteworthy, it takes on even greater significance when considered together with the score on a task that addressed Jimmy's "premorbid intellectual ability".  A comparison of the two reflects a "meaningful decline" in intellectual functioning over time.  *Id.* at p.8.  Although Dr. Ouaou cannot state with certainty the cause of this dramatic change, the most likely explanation is the 2019 TBI.

---

[5] Jenny E. Ozga, et al., *Executive (Dys)function After Traumatic Brain Injury: Special Considerations for Behavioral Pharmacology*, 29(7) BEHAV. PHARMACOLOGY 617, 617 (2018).

[6] *Id.*

[7] Ozga, *supra* note 5 at 618-19.

[8] *See* ftnt. 1, *supra*.

Other test scores reflect that Jimmy "has real and measurable brain-based cognitive impairments, most consistent with the effects of traumatic brain injury [.]" Report at p.8.  Specifically, "he demonstrated impairments in inhibition, cognitive flexibility, abstract reasoning, and problem solving." *Id.*  "These impairments would reasonably interfere with judgment, self-regulation, learning from experience, and efficient functioning in complex or unstructured settings." *Id.* at p.9.  But perhaps the most pertinent conclusion that Dr. Ouaou gleaned from the test results is that Jimmy's "impaired executive functioning unequivocally affects his ability to control impulses, especially under stressful circumstances."

As noted above, those who lack impulse control frequently "act[] without thinking" which is surely consistent with Jimmy's response when he picked up the gun that had been knocked from his pocket, an undeniably stressful circumstance. Again, he did not go to the Aladdin intending to harm Mr. Gonzalez.  But when confronted with unexpected resistance, he "act[ed] without thinking" and fired twice, a reaction that will haunt him for the remainder of his life.

To be clear, Jimmy is not seeking to use his mental infirmity to excuse his conduct at the hotel.  He recognizes that he should not have been there to meet with Kol and Mr. Gonzalez.  He recognizes that he should not have accepted the gun offered to him by Kol, especially as he did not plan to use it.  And he certainly laments that he was not better able to rein in his impulsivity when events in the room went off script.  Those realizations of course all factored into his decision to plead guilty

here.  But he wants to impress upon the Court that this was not an "execution style"

homicide, PSI at ¶52, but was instead the tragic result of a poorly devised plan.

Respectfully Submitted,

HECTOR A. DOPICO
Federal Public Defender

By:     */s/ Eric M. Cohen*_____
Eric M. Cohen
Assistant Federal Public Defender
Florida Bar No.  328065
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
Tel: (305) 530-7000
Email: Eric_Cohen@fd.org

*/s/ Christian Dunham*_____
Christian Dunham
Assistant Federal Public Defender
Attorney for Defendant Sanchez
Florida Bar No.  146587
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
Tel: (305) 530-7000
Email: Christian_Dunham@fd.org

*/s/Abigail E. Becker*
Abigail E. Becker
Assistant Federal Public Defender
Attorney for Defendant Sanchez
Florida Bar No.: 072284
150 W. Flagler Street, Suite 1700
Miami, Florida  33130-1556
Tel:   305-530-7000
E-Mail: Abigail_Becker@fd.org

7

**CERTIFICATE OF SERVICE**

I HEREBY certify that on **March 12, 2026,** I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing

document is being served this day on all counsel of record via transmission of Notices

of Electronic Filing generated by CM/ECF or in some other authorized manner for

those counsel or parties who are not authorized to receive electronically Notices of

Electronic Filing.


By: _/s/ Eric M. Cohen_____
Eric M. Cohen