UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-20264-CR-BLOOM

UNITED STATES of AMERICA,

    Plaintiff,

    v.

TSVIA KOL,

    Defendant.

_____ /

## OBJECTIONS TO THE PRESENTENCE REPORT

COMES NOW, *Tsvia Kol*, through counsel, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, respectfully files her objections to the presentence report and states the following:

I.    Objections that Impact the Guidelines.

Page 18: ¶58, ¶60; Page 20: ¶73, Page 21: ¶79, Page 22: ¶89, ¶93: Ms. Kol objects to: (1) the purity calculation of 98% for the methamphetamine seized, (2) a drug quantity of 4,843.9 grams of methamphetamine (actual), and (3) a resulting base offense level of 38. While Ms. Kol agrees with ¶58 to the extent the DEA laboratory report reflects a net weight of 4,843.9 grams, she objects to a purity of 98%. This is because the DEA laboratory report reflects a purity range rather than a single percentage. The lab report indicates the methamphetamine purity not as 98%, but as 98% +/- 6%. This means that the purity of the methamphetamine seized in this case may be as low as 92% or as high as 100%.

1

However, the lab report gives no further indication of determining the exact purity. Unlike most controlled substances, the purity of methamphetamine directly impacts the drug quantity and base offense level under the guidelines. *See* USSG § 2D1.1(c), Note (B) to Drug Quantity Table ("The terms 'PCP (actual)'…and 'Methamphetamine (actual)' refer to the weight of the controlled substance itself, contained in the mixture or substance. For example, a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual)"). Taking the net weight of 4,843.9 grams, a 92% purity would amount to 4,456 grams of methamphetamine (actual) and a base offense level of 36.

Because the purity of the methamphetamine is uncertain, the Court should adopt 92%, the low end of the purity range as indicated in the lab report, or decline to calculate actual drug weight altogether.

<u>Page 20-22: ¶71-93</u>:  Ms. Kol disagrees with Probation's conclusion that she has been convicted of multiple counts that cannot be grouped and constitute separate harms. Kol objects to the manner in which Probation calculated the total offense level using Chapter Three, Part D.

The PSR currently calculates the guidelines by separating the offenses into two groups, Group 1 (count 1) conspiracy to possess with intent to distribute methamphetamine, and Group 2 (count 3) causing death during a drug trafficking offense. By applying the grouping rules under U.S.S.G. § 3D1.4, Probation assigned one unit to each group, resulting in a 2-level increase to the highest offense level.

Ms. Kol objects to the 2-level increase applied under § 3D1.4. Kol asserts that count 1 and count 3 should be grouped together under § 3D1.2(a) and (c), § 1B1.5 and § 2D1.1(d)(1), as they involve: (1) substantially the same harm, (2) share similar offense characteristics, and (3) are so closely interrelated that they should be treated as single composite harm. In the case of counts grouped together pursuant to § 3D1.2(a)-(c), the offense level applicable to a group is the offense level determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts with the highest offense level in the group.

To prevent impermissible double counting, the Sentencing Guidelines direct that closely related counts of conviction be grouped together in determining the offense level when "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." U.S.S.G. § 3D1.2(c). Count 3 (18 U.S.C. § 924(j)) requires the commission of the drug trafficking crime as an essential element. Additionally, the PSR's calculation for Group 1 (the drug count) includes a 2-level enhancement under § 2D1.1(b)(1) for the possession of the firearm, and a 2-level enhancement under § 2D1.1(b)(2) for the use of violence. These specific offense characteristics in the drug guideline directly account for the same conduct that forms the basis of the murder charged in count 3. Failing to group these counts results in double counting.

3

Further, U.S.S.G. § 2D1.1 contains a cross-reference directive that requires grouping the offenses. The drug trafficking guideline § 2D1.1(d)(1), contains a specific cross-reference that directs that if a victim was killed under the circumstances that would constitute murder, the Court is to apply § 2A1.1 (First Degree Murder) or (as relevant to this case) § 2A1.2 (Second Degree Murder). When a guideline (like the drug guideline here) incorporates the conduct of another count (the death) through a cross-reference, those counts must be grouped to avoid an unwarranted increase in the offense level for conduct already factored into the base offense level for that offense.

Page 21-22: ¶75, ¶79, ¶87-89, ¶93: The Defendant objects to the 2-level enhancement for the use of violence applied under § 2D1.1(b)(2), and asserts the following: (1) the plain language of the enhancement shows the adjustment is defendant specific and does not apply to Ms. Kol, (2) the use of the enhancement against Kol creates an unwarranted sentencing disparity with her co-defendant Sanchez, the actual shooter who did not receive this adjustment, and (3) results in impermissible double counting.

U.S.S.G. § 2D1.1(b)(2) states: "if the defendant used violence, made a credible threat to use violence, or directed the use of violence, increase by 2 levels. The language of the adjustment is defendant specific, not offense specific. Under no circumstances did Kol use violence, make a credible threat to use violence, or direct that violence be used against Gonzalez, and therefore the 2-level adjustment does not apply to her. Moreover, applying this enhancement to

Kol while not applying it to Sanchez creates an irrational disparity among the Defendants. Sanchez was the individual who actually "struck Gonzalez," grabbed the gun and "shot Gonzalez twice," causing his death. Kol was not the individual who executed the violent act in this case. Her involvement, regrettably, was limited to doing what she was told to do, provide Sanchez with a firearm. It is logically inconsistent and legally unwarranted to apply a 2-level enhancement to Kol, when the actual perpetrator of the violent act has not received the enhancement.

The application of § 2D1.1(b)(2) also constitutes double counting because the violent conduct (the death of Gonzalez) is already factored into the offense level for count 3. The use of violence in this case is the shooting that resulted in the death of the victim. The PSR already accounts for this conduct by applying the Second-Degree Murder guideline (§ 2A1.2) for count 3. Applying an additional 2-level enhancement for the same violence within the drug count (count 1) punishes Kol twice for the exact same conduct. Because the violence is an inherent element of the cross-referenced murder guideline, adding a use of violence adjustment is redundant and impermissible double counting.

Under the commentary to § 2D1.1, when a death results, the guidelines direct the Court to use the homicide cross-reference. The Sentencing Commission intended for the homicide guideline to fully encompass the severity of the violent act. The (b)(2) enhancement is generally intended for drug cases where violence is used but does not result in the death that triggers the homicide

cross-reference. By adopting the murder guideline, the violence has already been incorporated into the base offense level. Applying (b)(2) on top of that is a misapplication of Chapter 2 framework.

Page 22: ¶93, Page 39: ¶165: Ms. Kol objects to Probation's determination of a total offense level of 41 and guideline range of 360 months to life. Should the Court agree with Kol's objections, her total offense level is 35, and her criminal history category is II. This results in a recommended guideline range of 188-235 months.[1]

| Base Offense Level: | 36 |
|---|---|
| Specific Offense Characteristic: Dangerous Weapon Possessed | +2 |
| Adjusted Offense Level: | 38 |
| Acceptance of Responsibility: | -3 |
| Total Offense Level: | 35 |

Page 40: ¶172: Ms. Kol believes that based on the total offense level, paragraph 172 should indicate the guideline fine range is $40,000 to $10,000,000.

---

[1] Notably, under U.S.S.G. § 5G1.2(d) the Court has discretion to impose the sentence in this case concurrent with the undischarged term of imprisonment in Docket No. 22-Cr-60242-Singhal.

II.     <u>Objections that have No Impact on the Guidelines</u>.

<u>Page 3: Aliases</u>:  Ms. Kol's true name is Tsvia T. Kol. She has used the nickname Sapir, but has never used an alias or any other name mentioned in this paragraph.

<u>Page 5: ¶9</u>: Probation indicated that Ms. Kol has received two infractions for possessing unauthorized items while in custody, on August 6, 2024 and February 11, 2026. Probation failed to include that the unauthorized item in both occasions was an earring. The Defendant recognizes that any infractions while in custody should be avoided, however, these minor infractions appear to be the result of an on-going personality conflict with a particular unit manager at FDC.

<u>Page 5: ¶11</u>: Ms. Kol objects to being characterized as a member of the Drug Trafficking Organization.

<u>Page 6: ¶12</u>:  Probation states, "The investigation revealed that Kol sold ounce quantities but had one customer to who she sold pounds of methamphetamine. Kol paid between $4,000 and 4,500 per pound of methamphetamine in Mexico." It should be pointed out that this statement is offense conduct from Ms. Kol's first case, 22-60242-Cr-Singhal, and does not involve offense conduct for the instant case. See Criminal History, page 25, ¶2.

<u>Page 12: ¶30 ¶32</u>:  Ms. Kol points out that the exchange of the firearm occurred when meeting with Sanchez in Hallandale Beach earlier in the day, not as indicated by Probation in paragraph 32. In paragraph 32, Probation suggests

7

that Kol provided Sanchez with the firearm at the Aladdin Hotel. That is not correct.

Page 15: ¶45:  Ms. Kol was not in a prior relationship with Carlos Alonso-Nunez-Sanchez.

Page 16: ¶50:  The exchange of the firearm is more accurately explained by Probation in this paragraph. The exchange occurred earlier in the day, when she met Sanchez in Hallandale. Ms. Kol objects to Probation's statement that Kol thought Sanchez's purpose was to "rough up" Gonzalez. Kol never said this. Ms. Kol did not believe Sanchez was going to harm Gonzalez.

Page 17: ¶53:  Although Sanchez was near Gonzalez in the small confined room at the Aladdin Hotel, the shooting was not "execution style." The men were in close proximity when the shots were fired as they had been engaged in an altercation just moments before. However, the shooting by Sanchez was not execution style.

Page 17: ¶54:  Ms. Kol acknowledges that she spoke with Sanchez after the shooting and told him that "he shouldn't have done that." However, Kol believes Probation has conflated her conversations with the source of supply in Mexico with her conversations with Carlos Nunez-Sanchez. Ms. Kol maintains that she did not speak with the source of the drugs after the murder, but she did speak to Nunez-Sanchez who was in Mexico.

Page 18: ¶56:  There is a typo in the year. It should be July 10, 2024.

8

Page 18: ¶60, Page 19 ¶61:   The Defendant objects to Probation's characterization that she participated in murder with Sanchez. There was no plan to harm or kill Gonzalez.

Page 30: ¶108:   The Defendant's maternal sister Eden Yepes was born in New York. Her maternal brother Ravid Yepes was born in Isreal. Probation also states: "The family then relocated to Davie, Florida, for a few months, then went to St. Clairsville, Ohio for one year. Ms. Kol relocated to St. Clairsville on her own, without her immediate family, to live with her step sister, Sivan Ben Hamo.

Page 30: ¶109:   Ms. Kol met Theophilus Blackston in Ohio. The incident of trauma described in this paragraph occurred in Orlando, Florida.

Page 32: ¶117:   Probation states that Ms. Kol reported not requiring ongoing or intensive medical treatment for her Fahr Syndrome. This is incorrect. Tsvia suffers from a rare, degenerative neurological disorder for which there is no cure. She is currently prescribed high-dosage Vitamin D in an attempt to target abnormal calcium deposits in certain parts of her brain. Follow-up examination is necessary to determine the effectiveness of this treatment and additional, ongoing care is required to monitor her condition as it progresses.

Page 32: ¶124, Page 33: ¶130:   Ms. Kol is prescribed 225mg of Venlafaxine, not 75mg.

Page 33: ¶131: The February 3, 2026, sexual victimization assessment and psychosocial assessment were provided to Ms. Kol and other female inmates in

9

her unit as part of a PREA claim made by another inmate in the unit.[2] While Kol answered questions in the assessments, she did not seek additional forms of treatment as the claim did not involve her, nor was she effected by the claim made by the other inmate.

**BENJAMIN, AARONSON, EDINGER & PATANZO, PA**

*s/; Peter T. Patanzo*
Fla. Bar No. 174645
1700 East Las Olas Blvd, #202
Fort Lauderdale, Florida 33301
Tel:   (954) 779-1700
ppatanzo@benjaminaaronson.com
Counsel for Tsvia Kol

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been uploaded and filed on CM/ECF on this 19th day of March, 2026, and served on all those associated with the electronic service list on this same day.

*s/; Peter T. Patanzo*
PETER T. PATANZO, ESQ.

---

[2] The Prison Rape Elimination Act (PREA) is a 2003 federal law establishing a "zero tolerance" for sexual abuse and harassment in correctional facilities.

10