UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:24-cr-20264-BB

**UNITED STATES OF AMERICA**,

vs.

**TSVIA KOL**,

*Defendant.*

_____/

## DEFENDANT KOL'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE

Defendant, TSVIA KOL, through counsel, respectfully files this Sentencing Memorandum. The Presentence Investigation Report calculates Tsvia's advisory guideline range, which remains contested.  Pursuant to Title 18, United States Code § 3553(a), the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a)(2).

## INTRODUCTION

The Court in determining Defendant's sentence shall consider, *inter alia*, "the nature and circumstances of the offense and history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

The death of the victim, Julio Gonzalez, has deeply affected Tsvia Kol. Tsvia had no intention or plan to harm Julio, a long-time acquaintance in Miami's drug

1

and party scene. On November 29, 2022, Tsvia did not contemplate that co-defendant, Jimmy Sanchez, would shoot Julio with a firearm she previously furnished him.

Before charges were ever filed in this case, Tsvia voluntarily met with the Government and federal agents. She furnished critical information as to the timeline of events leading up to Julio's death, identities and roles of individuals, and evidence the Government likely would not have discovered but for her cooperation.

On November 29, 2022, 34-year-old Tsvia had lived a life filled with trauma – child abuse, sexual abuse, substance abuse, neglect and abandonment, family dysfunction, and instability – from which she never properly adjusted. In fact, while incarcerated Tsvia was assessed by a neuropsychologist for Adverse Childhood Experiences (ACEs), scoring an 8 out of 10.[1]

Tsvia's incarceration commenced on December 1, 2022. It was in custody that Tsvia, for the first time, began to confront her past. While incarcerated, it was discovered that Tsvia has a rare, degenerative, neurological disorder. This diagnosis partly explains some of Tsvia's poor life decisions.

Now, Tsvia is sober from all substance use. She has begun the slow process

---

[1] The Adverse Childhood Experiences (ACEs) Questionnaire is a measure designed to assess childhood trauma and neglect. Only one in ten people will score five or more on the ACE measure, with higher scores predictive of perpetuating adversities, such as drug use, abuse and mental illness. *See* Report by Dr. K. Drorit Gaines, Ph.D., ("Dr. Gaines Report") filed under seal.

of healing from her drug use, childhood trauma, and dysfunctional relationships. Incarceration for Tsvia has mended many strained familial relationships, most notably the relationship between her and her mother.

## I.        Childhood Trauma

Tsvia Kol was born on April 22, 1988 in Jerusalem, Israel to father, Simon, and mother Sigalit (hereinafter "Sigi"). When Tsvia was two years old, her brother Yakov Kol, was born. Yakov was diagnosed with kidney cancer at two months, spending most of his short, seven-month life in the hospital. The premature death of Yakov ruptured an already volatile marriage between Sigi and Simon, characterized by controlling behavior from Simon. Following Yakov's death, unbeknownst to Simon, Sigi fled to Eilat, Israel taking Tsvia with her.

Tsvia was largely neglected while Sigi cared for her deteriorating son. The devastation Yakov's death brought Sigi left her without the emotional capacity to adequately nurture Tsvia. At the same time, Tsvia, too young to fully understand, believed that her mother had taken her brother and father away from her. Tsvia's sense of isolation was later exacerbated by the remarriages of both her parents and the birth of their new children – Tsvia's half-siblings. Sigi went on to form a long-term relationship with Isaac Cohen before later marrying Victor Yepes, with whom she has two children, Ravid and Eden. Simon also remarried to Irit Kol, and bore additional children, Yarden and Yuval. Sigi's subsequent partners each abused Tsvia

3

in different ways. The abuse, coupled with Tsvia's exclusion by her family, contributed significantly to Tsvia's lifelong struggle with belonging, identity, and self-worth.

Sigi's relationship with Isaac Cohen lasted from the time Tsvia was around three years old until age twelve. Isaac physically abused Tsvia, frequently hitting and punching her in the face and other areas of her body. Tsvia developed suicidal ideations, that included thoughts of drowning herself in a bathtub. During this time Tsvia also developed a voiding dysfunction, where she would hold back her urine for long periods of time. Voiding dysfunctions are common in many children who have endured abuse.[2] Tsvia's voiding dysfunction ceased when Sigi ended her relationship with Isaac.

When Tsvia was 13 years old, Sigi began a relationship with her current husband, Victor Yepes. Victor made inappropriate sexual comments towards Tsvia and engaged in voyeurism. Tsvia caught Victor peeping into her bedroom and through the window of her shower. However, when Tsvia confronted her mother and grandmother about Victor's behavior, instead of protecting Tsvia, they accused her of jealousy. On one occasion, Victor told Tsvia he had a dream that Tsvia was coming out of the shower and her towel fell off. Tsvia turned to her mother for help, who instead kicked her daughter out of the family home. This was not the only

---

[2] Dr. Gaines Report at 16.

instance in which Tsvia was kicked out of the home by her mother. Years later, while living at her mother's home, Tsvia uncovered a hidden camera Victor installed in her bedroom. Tsvia confronted her grandmother, who was shocked but did not want Tsvia to "ruin" her mother's life. So, Tsvia was persuaded not to disclose this incident to Sigi.

Tsvia constantly attempted to get her mother's attention and approval – "A hunt for Sigi's love," is how Tsvia described it. Tsvia has no memories of her mother playing with her as a child or helping her with homework. Although Sigi would provide materially for her daughter, she was emotionally cold towards Tsvia and even verbally and physically abusive. Sigi criticized every aspect of Tsvia's identity: her appearance, intelligence, friends, education and romantic relationships while offering little emotional support or guidance. Sigi regularly degraded Tsvia as to her weight, calling her a "cow," and "fat," as well as other names including "stupid" and "worthless."  For many years the two did not speak to one another.

Tsvia's ostracization by her family and peers led her to seek acceptance in the wrong places. Tsvia's mother recalls inviting children to Tsvia's birthday party, but no one showed up. Shy and lonely, Tsvia did poorly in school and was bullied by her classmates, primarily due to her weight. Her low self-esteem led her to seek validation from others whom she was eager to please.  In middle school, Tsvia began hanging around the wrong crowd, experimenting with alcohol, cigarettes and

marijuana. As an adult, Tsvia found acceptance in the drug and party scene. Dozens of relocations, between Israel and the United States, and within the United States, further disrupted Tsvia's development.

## II. Substance Abuse

Tsvia's decades-long drug use began shortly after she dropped out of high school. At the start of her tenth-grade year, Tsvia's family moved to Germantown, Maryland. It was in Maryland that Tsvia caught a glimpse of belonging and acceptance. Tsvia began to thrive while enrolled in English for Speakers of Other Language (ESOL) classes. For the first time in her life, Tsvia was happy. However, her time in Maryland was abruptly cut short less than a year later due to Victor losing his job. As a result, the family returned to Hollywood, Florida. Tsvia never returned to school.

Thereafter, Tsvia went to live in Ohio with her stepsister, Sivan. Here, 18-year-old Tsvia met Theophilus Blackstone, a man in his 30s. Theophilus drugged and raped Tsvia, who became pregnant and aborted the pregnancy. Later, Tsvia learned that Theophilus was in jail for murder.

Shortly after, Tsvia moved back to Hollywood, Florida to work at Sigi's cellphone accessory business. Tsvia moved into an apartment with a girl named Kimberly, who introduced Tsvia to cocaine and the "party scene," which included frequenting clubs at the Hardrock and later Club Space in Miami. The party scene

became Tsvia's community. It was an environment that welcomed her with open arms. Tsvia was accepted, had friends, and knew everyone. This feeling of acceptance, wholly absent from Tsvia's life, was augmented through numerous drugs that helped her lose weight and mask her emotional scars. Tsvia transitioned from using cocaine to ecstasy and MDMA, then Ketamine, Gamma Hydroxybutyrate (GHB), and ultimately Methamphetamine.

Tsvia's drug usage escalated from weekend-use to everyday once she began snorting and smoking methamphetamine. Tsvia became addicted, only wanted to get high, and bounced from one living situation to the next. All of Tsvia's money went towards obtaining methamphetamine. Tsvia hid her drug use from her family, smoking meth daily until her arrest in December, 2022.

### III.   Relationship with Wilfredo Nunez-Gallardo

Tsvia was already groomed by a life of trauma and rejection when she met Wilfredo Nunez-Gallardo, a man 20 years her senior. Wilfredo abused Tsvia physically, emotionally, and sexually. He also is responsible for introducing Tsvia into selling drugs.

In 2019, Tsvia was 30 years old when she met 50-year-old Wilfredo, an undocumented immigrant from Mexico. Their relationship became quickly and increasingly volatile as Wilfredo, an alcoholic and meth addict, implemented measures of coercive control. Wilfredo cut Tsvia off from any sort of independence,

forcing her to stop working at a car dealership where she was employed. He then enlisted her help for his own personal gain in the drug selling business he was involved in with his two sons, Carlos and Hector.

Wilfredo's manipulation was insidious. He would take Tsvia's phone and car and disappear for days at a time. He also physically asserted dominance, attacking Tsvia without provocation. He would punch and choke Tsvia until she almost lost consciousness and forced sex with Tsvia at times when she said "no." On many occasions, Wilfredo threatened to kill Tsvia and, on one occasion, he put a gun to Tsvia's head. Out of fear and shame, Tsvia kept silent about the abuse she suffered at the hands of Wilfredo. Even after Tsvia ended the relationship, Wilfredo would stalk Tsvia, showing up to her apartment and other places she frequented.

Tsvia could not rid herself of Wilfredo once he coerced her into the drug selling business, as Tsvia began answering to Wilfredo's sons, dangerous individuals who lived in Mexico.

### IV. Fahr Syndrome

Tsvia suffers from Fahr Syndrome, a rare, incurable, neurodegenerative disorder marked by abnormal calcium deposits in specific areas of the brain.[3] In

---

[3] Dr. Gaines Report at 19; The prevalence of Fahr is less than one in one million individuals. Vincentius Diamantino Supit et al., *Fahr Syndrome and Neurological Manifestations in Hypoparathyroidism Patients,* 19 Radiology Case Rep. 1248, 1249 (2024).

fashioning a sentence that is sufficient, but not greater than necessary, the Court shall consider the need to provide medical care for Tsvia in the most effective manner. *See* 18 U.S.C. § 3553(a)(2)(D).

In August, 2024, Tsvia suffered a head injury after an unprovoked attack by another inmate at the Federal Detention Center in Miami, Florida. This prompted a visit to Larkin Community Hospital where Tsvia underwent multiple computed tomography (CT) scans of her brain. The brain scans revealed hyperdensities – or put otherwise, abnormal calcifications – in the bilateral basal ganglia. Due to Tsvia's age, these calcifications were considered by Larkin's doctors to be pathological and possibly caused by Fahr disease / Fahr syndrome.[4] Tsvia's Fahr diagnosis was confirmed based upon these brain scans, the presence of hypothyroidism (diagnosed in 2016), neuropsychiatric symptoms (depression and anxiety), and cognitive impairment.[5]

Tsvia has low average intellectual functioning[6] and an array of long-standing cognitive deficits, some of which were first identified in Tsvia as a teenager.[7] These

---

[4] There is no difference in clinical presentation between Fahr disease and Fahr Syndrome. *See* Andrea Zangrandi et al., *Imaging and Neuropsychological Profile of Four Patients With Fahr's Disease*, 11 Psychol. & Neurosci. 68, 70 (2018).

[5] Dr. Gaines Report at 9.

[6] Tsvia's Full Scale Intellectual Quotient (FSIQ) is 83, which is within the low average range. *See* Dr. Gaines Report at 15.

[7] In 2003, a psychoeducational assessment detected deficits in learning, auditory memory, organization and thinking. *See* Dr. Gaines Report at 10.

deficits are apparent in many areas of Tsvia's executive functions, including working memory, attention, concentration, planning and organizing information. Tsvia's impairments further extend to her fine motor functioning, processing speed, verbal and visuospatial memory, and perceptual reasoning. Simply put, Tsvia's memory is impaired, her processing of information regarding her surroundings and environment is impaired, and she has poor executive functioning marked by impulsivity that has likely affected her ability to make sound decisions.

Given the progressive and incurable nature of Fahr, Tsvia is projected to decline at an unknown rate. Severe neurological and cognitive decline associated with Fahr can manifest in dementia, loss of motor control, and seizures. Over time, symptoms that resemble Parkinsons will develop, such as clumsiness, gait dysfunction, slurred speech, dystonia and muscle cramping.[8] Behavioral impairments may arise and central nervous system symptoms, including chronic headache, loss of consciousness, and coma may also develop.

The multifaceted symptoms of Fahr underscore the need to provide Tsvia specialized and coordinated care. Close collaboration between different medical professionals such as neurologists, endocrinologists, psychiatrists, and physical therapists is strongly advised in managing Tsvia's condition.[9]

---

[8] Dr. Gaines Report at 19.
[9] Dr. Gaines Report at 20.

As Tsvia ages and her condition progresses, the Bureau of Prisons – chronically underfunded and understaffed – will be ill-equipped to adequately care for Tsvia.[10] The Department of Justice Office of the Inspector General ("OIG") has identified deficiencies in the provision of healthcare to inmates as a significant challenge.[11] In fact, the OIG recently determined that the delay in medical care and treatment for a particular BOP inmate with colon cancer who was eventually granted compassionate release was due to a number of factors, including severe understaffing at the facility's Health Services Unit, difficulty securing timely appointments with offsite medical providers, and inadequate procedures to ensure that inmates with serious medical needs were regularly seen by BOP medical providers.[12] In that instance, the facility did not have a Clinical Director and the inmate did not have a Primary Care Provider Team, contrary to BOP policy.[13]

---

[10] *See* Letter from Jamie Raskin, Ranking Member, H. Comm. on the Judiciary, et al., to William K. Marshall III, Director, Federal Bureau of Prisons (Feb. 20, 2026), at 2-3 ("As of the end of 2024, facilities were both overcrowded and understaffed…By far, the most significant challenge to BOP's ability to fulfill its public safety mission is its pervasive shortage of critical staff—particularly of correctional officers, healthcare professionals, and mental health specialists.")

[11] U.S. Dep't of Just., Off. Of the Inspector Gen., *Top Management and Performance Challenges Facing the Department of Justice 2025* (Jan. 2026), https://oig.justice.gov/sites/default/files/2026-01/TMPC-2025.pdf25

[12] U.S. Dep't of Just., Off. Of the Inspector Gen., *Investigation and Review of the Federal Bureau of Prisons' Conditions of Confinement and Medical Treatment of Frederick Mervin Bardell and Related Representations to the Court, Upon Referral by Senior U.S. District Judge Roy B. Dalton, Jr.* (Jan. 2026), https://oig.justice.gov/sites/default/files/reports/26-007.pdf.

[13] *Id.* at 35.

**The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment**

I.      **Tsvia's Likely Deportation is an Acceptable Basis for the Court to Vary from the Guideline Range**

Tsvia is a lawful permanent resident of the United States. As a noncitizen, she will likely face deportation to Israel once she has served her sentence. The United States Supreme Court has noted the risk of removal is especially pronounced for noncitizens convicted of offenses "related to trafficking in a controlled substance" because the discretionary relief from removal is generally "not available" for such individuals. *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010). In fact, the Presentence Investigation ("PSI") Report recommends as a special condition of supervision her removal from the United States. PSI ¶ 204.

Tsvia's status as a deportable alien will render her automatically ineligible to serve her sentence in a minimum-security facility.[14] She will also be ineligible to serve the last part of her prison term in a community confinement reentry program and may be precluded from other Bureau of Prisons (BOP) programs.[15] The Court may consider Tsvia's potential deportation and vary from the sentencing guidelines. *See United States v. Hercules*, 947 F.3d 3 (1st Cir. 2020) (defendant's potential future deportation is a factor that a sentencing court may consider under 18 U.S.C.

---

[14] Francesca Brody, *Extracting Compassion from Confusion: Sentencing Noncitizens After United States v. Booker*, 79 Fordham L. Rev. 2129, 2153 (2011).
[15] *Id.*

12

§ 3553(a)); *See also United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) (concluding that a sentencing court may depart below a defendant's guideline range where he, solely based on his status as a deportable alien, faces the prospect of objectively more severe prison conditions than he would otherwise).

On the right factual record, a defendant's potential deportation also may prove relevant to whether a sentence will adequately "protect the public from further crimes of the defendant." *Hercules*, 947 F.3d at 9; *United States v. Morales-Uribe*, 470 F.3d 1282, 1287 (8th Cir. 2006) ("[T]he need to protect the public from a defendant may be reduced in a case where, upon immediate release from incarceration, the Government will deport the defendant."). A review of Tsvia's past supports the notion that deportation, independent from any length of imposed incarceration, will protect the public from future crimes by Defendant.

During her decade-long addiction to methamphetamine, Tsvia attempted to get clean on several occasions by travelling to Israel. In Israel, Tsvia would detox and remain sober, albeit she would resume drug use upon returning to the United States. Tsvia's last trip to Israel is a clear testament that deportation will serve the purposes set forth in 18 U.S.C. § 3553(a)(2).

In 2017, Tsvia's methamphetamine use was out of control. She went to Israel, where she stayed with her grandmother, Vivian Lerner. After detoxing, Tsvia found employment as a front desk clerk at a hotel in Eilat, Israel. For the next two years,

Tsvia diligently worked 40-hour weeks helping to manage the 77-room hotel. Tsvia's supervisor at the hotel describes Tsvia, who never missed a day of work, as "one of the most dedicated employees" he has ever had. Unfortunately, Tsvia's time in Israel abruptly ended when the remainder of her close family living in Eilat moved to the United States. Tsvia, not wanting to remain in Israel alone, followed, and she soon fell back into the drug lifestyle.

In light of Tsvia's inevitable removal, a Guidelines sentence would impose a punishment greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2), particularly where the need to protect the public from further crimes of the defendant will be substantially mitigated by her deportation. A Guideline sentence will also fail to account for sentence disparities amongst inmates who receive the benefit of less time and less harsh sentences due to their citizen status. *See* 18 U.S.C. § 3553(a)(6) (the court in determining the particular sentence shall consider, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of criminal conduct.").

## II. Unwarranted Disparities in Methamphetamine Offenses and Proposed Amendments to the Sentencing Guidelines

The United States Sentencing Guidelines ("USSG") parallels the statutory proscription of methamphetamine. Under USSG § 2D1.1, the base offense level for

14

offenses involving methamphetamine varies based on purity.[16] Section 2D1.1's Drug Quantity Table sets different base offense levels for methamphetamine mixture and methamphetamine (actual) in a manner that reflects the statute's 10-to-1 quantity ratio.[17] For the vast majority of drug trafficking individuals sentenced under § 2D1.1, drug quantity determines the sentence.

The increasing purity of methamphetamine has caused some courts to question whether the guidelines distinction between methamphetamine (actual) and methamphetamine mixture serves as a reliable proxy for the sentenced individual's culpability. *See United States v. Robinson*, No. 3:21-CR-14-CWR-FKB-2, 2022 U.S. Dist. LEXIS 231041 at *8 (S.D. Miss. Dec. 23, 2022) ("The DEA data [provided by defendant] show that most methamphetamine confiscated today is 'pure' regardless of whether the defendant is a kingpin or a low-level addict."); *See United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1252 (D.N.M. 2017) (varying downward in part because the "methamphetamine Guidelines are not based on empirical data").

Growing concern of sentencing disparities led the Sentencing Commission to further examine methamphetamine cases, the results of which are published in a

---

[16] U.S. Sent'g Comm'n, Sentencing Guidelines for United States Courts, 90 Fed. Reg. 59,660, 59,662. (proposed Dec. 19, 2025).
[17] *Id.*

June, 2024 report.[18] The Commission's findings confirmed 1) the purity of methamphetamine has increased over time, 2) methamphetamine is now highly and uniformly pure, 3) sentences imposed for methamphetamine offenses are impacted by laboratory testing practices which vary across the nation, and 4) average sentences for methamphetamine offenses are longer than those for trafficking offenses involving other drugs.[19]

Individuals sentenced for trafficking methamphetamine mixture received shorter average sentences (83 months) compared with individuals sentenced for trafficking methamphetamine actual (93 months).[20] The difference in sentence length associated with methamphetamine actual and methamphetamine mixtures is, in part, impacted by laboratory testing practices.[21] In the study undertaken by the Commission, although laboratory testing was performed in roughly 75 percent of the methamphetamine offenses, testing occurred in less than half (47.6%) of the mixture offenses, but in nearly 90% of the methamphetamine actual offenses.[22] If the purity of the methamphetamine seized in Tsvia's case had not been tested for purity, her

---

[18] *See* U.S. Sent'g Comm'n, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System* (June 2024).
[19] *Id*. at 4-5.
[20] *Id*. at 5.
[21] *Id.*
[22] *Id*. at 29.

base offense level would be 32, compared to level 38.[23] This amounts to a guideline range difference of more than 10 years.[24]

In response to its findings, the Sentencing Commission has published proposed amendments to the 2026 Sentencing Guidelines aimed at addressing the purity distinction between methamphetamine in "actual" form and methamphetamine as part of a mixture. The Commission has put forth two alternatives, one would set the same quantity thresholds for all methamphetamine offenses, thereby deleting all references to "methamphetamine (actual)" from the Drug Quantity Table at § 2D1.1(c).[25] In doing so, the Commission has suggested the new quantity threshold for methamphetamine to match the current threshold for either: methamphetamine mixture, fentanyl, cocaine base, or methamphetamine (actual).[26] If the quantity threshold matched methamphetamine mixture, fentanyl, or cocaine base, Tsvia's base offense level would become either a Level 32 or 34 – a difference of four to six levels (and 4-10 years) from what Probation currently calculates her base offense level.

---

[23] Defendant Objects to the drug quantity and base offense level of 38 calculated by Probation in PSI ¶ 73.

[24] An offense level of 32 with a Criminal History Category II computes a guideline range of 135-168 months, whereas an offense level of 38 with a Criminal History Category II computes a guideline range of 262-327 months. USSG Ch. 5 Pt. A

[25] 90 Fed. Reg. at 59,663.

[26] *Id.*

This Court may grant Tsvia a variance based on its view that the methamphetamine guidelines create an unwarranted disparity and is at odds with 18 U.S.C. § 3553(a). *See Spears v. United States*, 555 U.S. 261, 263-64 (2009).

### III.   Post-Offense Rehabilitation

The Sentencing Commission has proposed amendments to the 2026 Sentencing Guidelines that would add a new Chapter Three Adjustment at USSG § 3E1.2 (Post Offense Rehabilitation).[27] The proposed adjustment allows for a decrease of up to five (5) offense levels if the defendant demonstrates prior to sentencing "positive post-offense behavior or rehabilitative efforts," or a "sustained commitment to positive behavioral change…beyond the typical actions undertaken by defendants prior to sentencing."[28]

In determining whether a defendant qualifies for this adjustment, factors such as the defendant completing a treatment program to address the abuse of drugs, completing a skills training and obtaining gainful employment, all of which Tsvia has achieved while incarcerated at the Federal Detention Center, are taken into consideration.

Tsvia has made the best of her time at the Federal Detention Center ("FDC") in Miami. She is a provider and companion to other troubled inmates. At one point,

---

[27] 90 Fed. Reg. at 59,681.
[28] *Id.* at 59,681-82.

she was awarded an orderly position, cleaning top-tier three times a week for the 95 women in her unit. Tsvia takes it upon herself to help the new women entering the facility, offering whatever toiletries she has to ensure they have as seamless a transition as possible. Tsvia, who is fluent in Hebrew, English, and Spanish, teaches English to other Spanish-speaking inmates.

Rabbi Yankee, who meets with Tsvia twice a week at FDC, notes that she is "more calm and very family-oriented". Tsvia regularly attends religious services and diligently prays. Tsvia now moves with purpose, seizing every opportunity to better herself. She has successfully completed many programs at FDC, including, but not limited to, the Lifestyle Program, Business Planning, Public Speaking and Nonresidential Drug Treatment.

The fact that Tsvia would likely receive this adjustment if it were currently in effect serves as a reason the Court should consider granting a downward variance from Ms. Kol's current guideline range.

## IV.   Substantial Assistance

On April 11, 2024, Tsvia voluntarily participated in an interview at the U.S. District Courthouse, with members of the U.S. Attorney's Office, the Drug Enforcement Administration (DEA), the Federal Bureau of Investigations (FBI) and Homeland Security Investigations (HSI). At this time, no charges had been filed in this case and no cooperation agreement had been extended by the Government.

19

At this meeting, Tsvia divulged a wealth of information. Importantly, Tsvia provided specific details of the offense unknown to the Government, that likely would have remained unknown but for her interview. This included the details surrounding the methamphetamine shipment, Julio's role and involvement, the orders she was given by Carlos (Wilfredo's son) to arrange travel for Jimmy Sanchez and Joseph Torres, the events that led up to the shooting of Julio, Tsvia's own role, and that Jimmy Sanchez shot Julio Gonzalez. Notwithstanding an investigation by federal agents that had been ongoing for nearly a year and a half, the Government was not aware of Tsvia's specific involvement nor that of her co-defendant, Jimmy Sanchez. The information she provided the Government was critical, and served as the basis, in part, for the return of the Indictment, and also to Sanchez's swift readiness to take a plea.

Many sister circuits have held that a sentencing court has the power to consider a defendant's cooperation under § 3553(a), irrespective of whether the Government files a §5K1.1 motion. *United States v. Robinson*, 741 F.3d 588, 599 (5th Cir. 2014). A sentencing court's failure to recognize its discretion to consider a defendant's cooperation under § 3553(a)(1) is a significant procedural error. *Id.*

Due to the substantial nature of Tsvia's assistance, the Court should grant Tsvia a sentence variance, even if the Government does not file a motion pursuant to USSG § 5K1.1.

20

## CONCLUSION

In Fiscal Year 2024, 22.2% of sentences for methamphetamine trafficking were substantial assistance departures, with the average sentence reduction 48.7%.[29] Another 40.8% of the sentences for methamphetamine trafficking were downward variances, with the average sentence reduction 35.2%.[30] The circumstances of Tsvia's life, along with her medical prognosis, likely deportation, substantial assistance rendered to the Government, and proposed amendments to the Sentencing Guidelines that would benefit her if currently in effect, demonstrate that a Guideline sentence does not serve the purposes of 18 U.S.C. § 3553(a)(2). Rather, a downward variance would more appropriately comport with this Court's requirement to fashion a sentence that is sufficient, but not greater than necessary.

WHEREFORE, Tsvia Kol respectfully requests that this Court fashion a sentence that is sufficient, but not greater than necessary, in accord with the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

---

[29] U.S. Sent'g Comm'n, *Quick Facts: Drug Trafficking Offenses* (Fiscal Year 2024), https://www.ussc.gov/research/quick-facts.
[30] *Id.*

**SCOTT W. SAKIN, P.A.**
CJA Learned Counsel for Tsvia Kol
2883 Executive Park Drive, Suite 104
Weston, Florida 33331-3662
Tel. (954) 779-7879
Tel. (305) 545-0007
E-mail: scott@sakinlaw.com

By: __*/s Scott W. Sakin*_____
      SCOTT W. SAKIN
      Florida Bar No. 349089

**BENJAMIN, AARONSON, EDINGER
& PATANZO, PA**
*s/ Peter T. Patanzo*
Fla. Bar No. 174645
1700 East Las Olas Blvd, #202
Fort Lauderdale, Florida 33301
Tel: (954) 779-1700
ppatanzo@benjaminaaronson.com
Counsel for Tsvia Kol

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically with the Clerk of the Court through the CM/ECF system and copies of same distributed to all counsel of record and all known interested parties on this 21st day of March, 2026.

By: __*/s Scott W. Sakin*_____
      SCOTT W. SAKIN
      Florida Bar No. 349089

22